**COMMITTEE OF 100 ON the FEDERAL CITY, et al., Plaintiffs,**

v.

**Donald P. HODEL, Secretary of the Interior, et al., Defendants.**

Civ. A. No. 85–0059.

United States District Court, District of Columbia.

May 30, 1985.

Cornish F. Hitchcock, Public Citizen Litigation Group, Washington, D.C., for plaintiffs.

Mitchell R. Berger, Asst. U.S. Atty., Washington, D.C., for Federal defendants.

Irwin Goldbloom, William C. Kelly, Jr., David D. Sandalow, Latham, Watkins & Hills, Washington, D.C., for defendant-intervenor Rosewood Hotels, Inc.

David H. Schwartz, Robert J. Kheel, S. Scott Morrison, Wilkie, Farr & Gallagher, Washington, D.C., for defendant-intervenor Washington Harbour Associates.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, District Judge:

### INTRODUCTION

The plaintiffs in this proceeding are four local organizations concerned with and interested in the maintenance and preservation of federal parklands in Washington,

D.C. ("District of Columbia" or "District"). They seek to set aside a decision of the National Park Service [1] ("Park Service" or "NPS") to surrender an easement restricting building heights on a parcel of land on the waterfront in the Georgetown section of the District of Columbia to 20 feet or one story. The land involved is situated along the banks of the Potomac River and Rock Creek. The surrender of the easement would permit construction of a 60 foot office building and a 52 foot hotel building by a private developer, Washington Harbour Associates ("Washington Harbour" or "WHA"). In exchange for the surrender of the easement, the developer would convey to the Park Service certain access and scenic easements on its privately-owned land and neighboring property and make improvements on that as well as on adjoining Park Service land.

The plaintiffs include two citizen groups, the Committee of 100 on the Federal City and the Committee for Washington & Riverfront Parks ("organizational plaintiffs"), who bring this action on behalf of their members, and the Human Environment Institute and the Environmental Policy Institute ("institutional plaintiffs"), who pursue this action on their own behalf. The named defendants are the Secretary of the Interior, and two National Park Service officials who are sued solely in their official capacities ("federal defendants"). In addition, the Court permitted Washington Harbour Associates, the owner and developer of the privately-owned property involved herein, and Rosewood Hotels, Inc. ("Rosewood"), the planned purchaser of a portion of the private development, to intervene as defendants ("defendant-intervenors").

Plaintiffs are seeking injunctive and declaratory relief to prevent the proposed exchange of interests between Washington Harbour and the Park Service on the grounds that it violates a 1977 amendment to the Land and Water Conservation Fund Act of 1965, 16 U.S.C. § 460*l*–9(c). In the alternative, plaintiffs seek a remand to the Secretary of the Interior of the decision to enter into the agreement on either of two independent grounds: failure to hold a public hearing in violation of statutory authority, 16 U.S.C. § 460*l*–22(b), or that the Secretary's determination that the interests being exchanged were approximately equal in value was arbitrary and capricious.

Before the Court are cross motions for summary judgment.[2] This matter has been extensively briefed and ably argued by counsel for the parties. After review and consideration of the record, the pleadings and submissions of the parties, the Court concludes that plaintiffs' motion for summary judgment should be granted and that the proposed exchange of interests be enjoined.

## BACKGROUND

This controversy deals with a section of land situated on the shore of the Potomac River bordering Washington, D.C. The entire shoreline of the Potomac River in the District is owned and managed by the federal government through the Park Service, with the exception of a particular area of the shoreline known as the Georgetown Waterfront.[3] A sizeable portion of the entire Potomac shoreline outside of the District is publicly owned. A long-established goal of the federal government has been to acquire and protect as much of the Potomac shoreline as possible. March 25, 1985 Affidavit of Manus J. Fish, Jr., Regional Director for the National Capital Region of NPS at ¶ 3.

The Georgetown Waterfront area consists of approximately 19 acres of land. Six acres are privately owned, eight acres are owned by the District, two and one half

---

**1.** The National Park Service is a unit within the Department of the Interior. 16 U.S.C. § 1.

**2.** Because they raise the question of standing, the federal defendants' motion is a motion to dismiss or for summary judgment. With the exception of the standing argument, the briefs submitted by the federal defendants and the defendant-intervenors raise identical arguments.

**3.** The Georgetown Waterfront extends along the Potomac River from the Potomac Palisades to the west and Rock Creek to the east.

acres are owned by the federal government, and two and one half acres are local street right-of-ways. The federal government obtained its land on the Georgetown Waterfront in 1938 when it purchased the Chesapeake and Ohio Canal. Compl. at ¶ 10. The receivers of the Canal withheld nineteen parcels of land from sale to the government which were then being used primarily by the Baltimore and Ohio Railroad. However, the United States was able to acquire an easement over one of the nineteen parcels of land. That portion, known as Parcel G, consists of approximately 1.21 acres of land. The easement limits the height of buildings on that Parcel to 20 feet or one story. Formalized in 1941, the restrictive height easement still runs with the land.[4]

Washington Harbour Associates owns some of the private Georgetown Waterfront property. That property is located in three parcels: lot 102,[5] lot 81,[6] and lot 97.[7] Lots 81 and 97 comprise Parcel G. In 1979, the then-Secretary of the Interior rejected a plan to purchase the privately held Georgetown Waterfront property. The purchase price was estimated to be $22 million. Fish Aff. at ¶ 7. The Park Service then entered into an agreement with the District of Columbia, the National Capital Planning Commission,[8] and WHA for joint development of the Georgetown Waterfront area. That agreement involved some land exchanges, including the easement at issue in this matter. The developer's design plans, however, were rejected by the Commission of Fine Arts in 1980. Fish Aff. at ¶¶ 8–9. Because the joint development plan had been effectively foreclosed, WHA decided to implement its own plans for development on Lot 102. Washington Harbour was able to proceed with its plans absent NPS involvement because no federal interests are involved on that land. That development, known as Phase I, is currently under construction as a complex for office, retail, and residential purposes.

Washington Harbour then sought to pursue its interest in developing Parcel G (Lots 81 and 97). That development is known as Phase II. Defendant-intervenor Rosewood has contracted to purchase the developed Phase II properties from Washington Harbour.

In 1983, WHA and the NPS began negotiating toward another comprehensive agreement which would encompass the Georgetown Waterfront area. An agreement was reached for a proposal which the government stated would "guarantee permanent public access along the waterfront and Rock Creek, ... preserve river views from Georgetown, and allow landscape improvements to National Park Service lands." 48 Fed.Reg. 55643 (Dec. 14, 1983). In exchange, the government surrendered the restrictive height easement on Parcel G.

The proposal was set forth in an Environmental Assessment ("EA") in December, 1983, which was made available to the public through notice in the Federal Register. *Id.* Under the proposed exchange, WHA would guarantee permanent public access and scenic easements on its property along the Potomac River and Rock Creek, provide a scenic easement on a portion of its Phase I property and also agree to landscape and maintain the public access easement areas as well as certain adjacent parklands. In

---

**4.** The purpose and the history of the easement are described *infra* at 26–27 (Aff. of John Nolen, Jr.).

**5.** Lot 102, square 1173, is located between 30th and 31st Streets, N.W., south of K Street, N.W., and north of the Potomac River.

**6.** Lot 81, Square 1171, is located between 30th Street, N.W., and Rock Creek Park, south of K Street, N.W., and north of an unopened extension of Virginia Ave., N.W.

**7.** Lot 97, Square 1172, is located between 30th Street, N.W., and Rock Creek Park, south of an unopened extension of Virginia Ave., N.W., and north of an area, owned by the federal government, along the Potomac River known as the "Mole."

**8.** The National Capital Planning Commission, an independent federal agency, is responsible for acquiring all NPS land in the District of Columbia. 43 Stat. 463; D.C.Code §§ 1–2009; 8–101 (1981).

return, NPS would relinquish the height restriction on the Phase II properties in favor of a 60 foot height restriction and would grant WHA an easement over the bed of the Potomac for construction of a seawall, boardwalk and dock. Fish Aff. at ¶ 14.

On January 17, 1984, following the Federal Register notice, the NPS held a public hearing on the Environmental Assessment of the proposed exchange. The Commission of Fine Arts then held a public meeting on January 31, 1984 to consider the design plans for the proposed project. Based on comments made at those hearings, NPS sought legal advice from the Department of the Interior as to whether NPS had the authority to enter into the proposed exchange of interests. On March 9, 1984, the Solicitor's Office advised NPS that it did have such authority.[9] WHA then submitted a draft deed of exchange which was rejected by NPS on March 12, 1984.

In rejecting the draft, NPS indicated that certain · changes should be made in the agreement, including a decrease in the height of the buildings on Phase II and a further increase in the setback of the buildings from the shoreline. The Park Service also sought additional landscaping and maintenance guarantees, $1 million to construct a park on federal property along the Potomac River west of 31st Street, N.W., and a promise to reconstruct the C & O Canal tidelock at an estimated cost of $350,000. WHA agreed to the changes on April 17, 1984. Thereafter, a revised EA was prepared and distributed. The final proposal provided for a hotel height of 52 feet and an office building height of 60 feet on the Phase II properties.

Additional hearings were held before the D.C. Historic Preservation Board, the Old Georgetown Board of Consultants to the Commission of Fine Arts, the Commission of Fine Arts, the C & O Canal Advisory Commission in June and July, 1984. Those boards and commissions, representing District of Columbia and federal interests, approved the proposed exchange. In July, 1984, plaintiffs requested that the Park Service hold a public hearing on the subject of valuation of the proposed exchange. That request was rejected in short order.

On August 2, 1984, the National Capital Planning Commission approved the proposed exchange in a public hearing. At that time, pursuant to its statutory authority, 43 Stat. 463; D.C.Code §§ 1–2009; 8–101 (1981), the Commission established a national park encompassing the Georgetown Waterfront area.[10] In October, 1984, the NPS stated its intention to enter into the proposed exchange with WHA.

The process of valuing the interests to be exchanged in the NPS–WHA agreement began in December, 1983. NPS returned WHA's initial appraisal submitted to it in January, 1984 for consideration of additional economic and valuation factors. Another appraisal was submitted in May, 1984, which NPS also concluded would need to be revised. WHA's final appraisal was received on July 20, 1984. Thereafter, NPS proceeded to evaluate and analyze the appraisal and concluded that the interests exchanged were of "approximately equal value" in accord with 16 U.S.C. § 460*l* –22(b).[11]

---

**9.** This authority was pursuant to 16 U.S.C. § 460 *l* –22(b). *See infra* at 21–24.

**10.** The Georgetown Waterfront Park has as its boundaries K and Water Streets, N.W. on the north, the Potomac River on the south, Rock Creek and Potomac Parkway on the east, and Palisades Park (formerly Potomac Palisades Parkway) on the west.

**11.** NPS made its determination that the valuation was approximately equal through a three step analysis. The first step compared the value of the proposed exchange of easement interests.

That analysis concluded that WHA received a net benefit of approximately $2.1 million. The second step analyzed the costs of the fixed improvements on federal land and on the public access areas. NPS concluded that the cost to WHA of making those fixed improvements would be $2.2 million. The third step was to analyze the annual costs of WHA's landscape maintenance obligations, which it had agreed to undertake in perpetuity. NPS concluded that the first year cost of the maintenance would be $150,000. NPS claims that it did not capitalize either the third step maintenance costs or

After concluding its appraisal analysis, NPS announced its intention to enter into the proposed agreement in October, 1984. WHA and NPS executed a deed and an escrow agreement for the exchange on January 7, 1985. The agreement included the provisions for the scenic and access easements along the Waterfront, the scenic easement through Phase I, the landscape and perpetual maintenance agreements, the reconstruction of the C & O Canal tidelock, and the modification of the height restriction on Parcel G to allow a 52 foot building on the southern portion and a 60 foot building on the northern portion. The attached map, prepared by the defendants and utilized at the motions hearing (Exhibit 1), illustrates the proposed exchanges. A condition precedent to the agreement is the $1 million payment by WHA for construction of a waterfront park between 31st Street, N.W. and Wisconsin Avenue, N.W. The organizational and institutional plaintiffs in turn filed the present complaint on January 8, 1985 challenging the decision of the federal defendants.

## ANALYSIS

The plaintiffs contend that the proposed exchange is unlawful because it violates 16 U.S.C. § 460*l*-9(c), a 1977 amendment to the Land and Water Conservation Fund Act of 1965, 16 U.S.C. § 460*l*-5. Alternatively, the plaintiffs argue that if the exchange is permitted, a remand is necessary either to hold a hearing on whether the statutory valuation condition has been met, 16 U.S.C. § 460*l*-22(b), or to supplement the record on the valuation question. In their motion for summary judgment, the defendants have raised several issues: the plaintiffs' standing, NPS' statutory authority to enter into the proposed exchange pursuant to 16 U.S.C. § 460*l*-22(b), the compliance with the public hearing requirement, *id.*, and the support in the record for the valuation decision. Before reaching the statutory argument, the Court must

consider whether plaintiffs have standing to challenge the proposed exchange.

## I. STANDING

The basic criteria for standing are clear and certain.

> Art. III requires the party who invokes the court's authority to 'show that he personally has suffered some actual or threatened injury as a result of the putatively illegal conduct of the defendant,' ... and that the injury 'fairly can be traced to the challenged action,' and 'is likely to be redressed by a favorable decision....'

*Valley Forge Christian College v. Americans United for Separation of Church and State, Inc.*, 454 U.S. 464, 472, 102 S.Ct. 752, 758, 70 L.Ed.2d 700 (1982) (*quoting Gladstone Realtors v. City of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1607, 60 L.Ed.2d 66 (1979); *Simon v. Eastern Kentucky Welfare Rights Org.*, 426 U.S. 26, 38, 41, 96 S.Ct. 1917, 1924, 1925, 48 L.Ed.2d 450 (1976)). The standing requirement itself is made up of a constitutional component, the redressable injury in fact test, and a prudential component. The prudential requirements are such that the plaintiff's complaint must allege more than a generalized grievance shared by the entire population and "that the plaintiff's complaint fall within 'the zone of interests to be protected or regulated by the statute or constitutional guarantee in question.'" *Valley Forge*, 454 U.S. at 475, 102 S.Ct. at 760 (*quoting Association of Data Processing Service Orgs. v. Camp, Inc.*, 397 U.S. 150, 153, 90 S.Ct. 827, 830, 25 L.Ed.2d 184 (1970)). *See also Glass Packaging Institute v. Regan*, 737 F.2d 1083, 1087–88 (D.C. Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 509, 83 L.Ed.2d 400 (1984).

Defendants contend that there is no allegation or showing that the plaintiffs actually use the national park area around which this litigation revolves or that they would be affected by the proposed develop-

WHA's $1 million contribution for adjacent park development because the approximately equal standard had been met after the first two

stages in that NPS received a net benefit of $102,000 through the easement and improvement agreements. Fish Aff. at ¶¶ 30, 31.

ment and that the injuries claimed are "undifferentiated" from that of the general public. Federal Defendants' Memorandum in Support of Motion to Dismiss or for Summary Judgment at 5. They do not appear to challenge the zone of interests requirement,[12] but rather focus on the injury in fact and generalized grievance principles. There should be little doubt that the organizational plaintiffs have standing to pursue an action on behalf of their members who contend that they would be injured by the proposed exchange. The Supreme Court has clearly held that the injury in fact test is satisfied where an environmental or aesthetic harm is claimed if the organization demonstrates that its members use the area and "claim[ ] that the specific and allegedly illegal action of the Commission would directly harm them in their use of the natural resources of the ... Area." *United States v. SCRAP*, 412 U.S. 669, 687, 93 S.Ct. 2405, 2416, 37 L.Ed.2d 254 (1973). The fact that the harm is generalized does not diminish their claim to standing. *Id. Cf. Sierra Club v. Morton*, 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972) (although a generalized environmental and aesthetic injury can constitute an injury in fact, plaintiff, who did not show a direct injury through its members use, did not have standing to sue).

The organizational plaintiffs have submitted an affidavit demonstrating that its members use the area affected by the proposed exchange. March 30, 1985 Affidavit of Ann Satterthwaite at ¶¶ 4, 5. The fact that the government is surrendering only air rights, rather than a parcel of property, does not diminish the injury. The alleged injury resulting from the exchange, namely taller structures on Parcel G, would directly impact the users of neighboring Rock Creek Park or the Potomac River. This injury is independent of the plaintiffs' desire to have the entire area converted into a

federal park and thus is a more concrete injury than a "disappointed dream." The harm occurs only when the height restriction is lifted as evidenced by the fact that Parcel G is currently privately held, yet plaintiffs are claiming no injury from the fact that the area is not an entire federally owned national park. The plaintiff organizations have satisfactorily established that they have standing to challenge the action taken by the National Park Service. *Capital Legal Foundation v. Commodity Credit Corp.*, 711 F.2d 253, 259 (D.C.Cir. 1983). *See also Glacier Park Foundation v. Watt*, 663 F.2d 882 (9th Cir.1981) (party seeking to challenge award of concession contract in national park had standing to sue because its economic and aesthetic interests were within the zone of interests); *National Audubon Society v. Hodel*, 606 F.Supp. 825, 831–33 (D.Alaska 1984) (organizations had standing to seek declaratory relief to prevent a proposed land exchange in Alaska authorized by the Secretary of Interior pursuant to statute which allows the exchange if it is determined to be in the "public interest" where the lands exchanged are of unequal value).

■ The determination of an institution's standing is also governed by the same principles as that which controls individual standing—the injury in fact test. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379, 102 S.Ct. 1114, 1124, 71 L.Ed.2d 214 (1982) ("If, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME'S ability to provide counseling and referral services for low-and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact"). The allegations in the affidavit submitted on behalf of the Human Environment Center indicates that pursuit of its goals would be injured by the pro-

---

**12.** It is clear that plaintiffs are within the zone of interests sought to be protected by the National Park Service legislation at issue. *See* 16 U.S.C. § 1a–1 ("these [national park system] areas derive increased national dignity and recognition of their superb environmental quality through their inclusion jointly with each other in one national park system preserved and managed for the benefit and inspiration of all the people of the United States ...").

posed exchange. April 3, 1985 Affidavit of Sydney Howe at ¶ 3.[13]

## II. STATUTORY INTERPRETATION

### A. 16 U.S.C. § 460*l*–22(b)

The defendants rely on 16 U.S.C. § 460*l*–22(b) ["§ 22(b)"], a 1968 amendment to the Land and Water Conservation Fund Act, *supra*, for their authority to proceed with the proposed land exchange. Section 22(b) provides:

> **Exchange of lands; other disposal; equal land values**
>
> b) The Secretary of the Interior is authorized to accept title to any non-Federal property or interest therein within a unit of the National Park System or miscellaneous area under his administration, and in exchange therefor he may convey to the grantor of such property or interest any Federally-owned property or interest therein under his jurisdiction which he determines is suitable for exchange or other disposal and which is located in the same State as the non-Federal property to be acquired: *Provided, however,* That timber lands subject to harvest under a sustained yield program shall not be so exchanged. Upon request of a State or a political subdivision thereof, or of a party in interest, prior to such exchange the Secretary or his designee shall hold a public hearing in the area where the lands to be exchanged are located. The values of the properties so exchanged either shall be approximately equal, or if they are not approximately equal, the values shall be equalized by the payment of cash to the grantor from funds appropriated for the acquisition of land for the area, or to the Secretary as the circumstances require. (Emphasis in original).

Defendants contend that § 22(b) permits the exchange of park land and that they have satisfied the conditions imposed by the statute. Therefore, they claim that the proposed exchange is lawful.

The Court does find that some of the conditions imposed by the statute have been satisfied by defendants.[14] Initially, the interest in property accepted by the Park Service from Washington Harbor is within a national park—the Georgetown Waterfront Park, created in August, 1984. Secondly, the easement on Parcel G is under the jurisdiction of the Secretary of the Interior and is located in the same state (the District of Columbia) as are the interests acquired from Washington Harbour.[15]

■ The Court further finds that Congress contemplated that land under Park Service jurisdiction could be exchanged under the authority of § 22(b). The statute, as an amendment to the Land and Water Conservation Fund Act of 1965, provided

---

**13.** The plaintiff, Environmental Policy Institute, has not submitted a similar affidavit in support of standing.

**14.** Plaintiffs, in oral argument, belatedly raise the issue that NPS had not complied with the § 22(b) requirement that a public hearing be held on the suitability question. The January 17, 1984 hearing satisfied that requirement. NPS believed that an environmental review hearing satisfied the statutory requirement on the suitability issue. Exhibit 4 to Federal Defendants' Motion for Summary Judgment at 3. The agency determination is entitled to deference and will not be disturbed. *Cf.* discussion at 21–22 *infra*. Plaintiffs, however, argue that no public hearing was held on the valuation question. They claim that this is a violation of § 22(b), especially in light of the fact that their counsel, on July 2, 1984, requested that such hearing be held. Exhibit 9 to Federal Defendants' Motion for Summary Judgment. That re-

quest was denied on July 12, 1984. Exhibit 10 to Federal Defendants' Motion for Summary Judgment.

The critical question in this respect is whether § 22(b) contemplates a NPS hearing on valuation. It is clear that the valuation question could not have been fully aired at the January, 1984 hearing as the appraisal data were not yet available. Exhibit 10, *supra,* at 2 ("This final appraisal will not be available to us until mid July at which time we will perform our final review"). Given the Court's decision on the statutory issue, there is no need to solve the dilemma left by the murky legislative history on this issue. *See, e.g.,* 114 Cong.Rec. 11010 (April 30, 1968) (Sen. Morse).

**15.** Because the Court concludes that the statutory scheme prohibits the proposed exchange, the question of the rationality of NPS' approximately equal value decision need not be reached.

for additional sources of revenue for the fund and also included miscellaneous provisions for dealing with land acquisition by the federal government. The legislative history of § 22(b) indicates that the House version of the bill originally contained language that permitted only federal land within the *same unit as the land received* to be exchanged. Since the statute states that the land received must be within the national park system, the legislators, by implication, intended to include park land as land which could be exchanged. *See* Conf. Report No. 1598, 90th Cong., 2d Sess. *reprinted in* 1968 U.S.Code Cong. & Admin.News 2613, 2632. The Senate version, which required that the federal land exchanged be only within the same state as the received land, was eventually adopted. One reason the Senate version was enacted was presumably due to the Secretary of Interior's letter to Senator Henry Jackson, chairman of the Senate committee considering the bill, which stated that

> The section as written, however, would not be of substantial value because it authorizes only the exchange of Federal property located within the boundaries of the park unit involved. There is a limited amount of Federal property within a park boundary that could be utilized for exchange purposes.

S.Rep. No. 1071, 90th Cong.2d Sess. 16, *reprinted in* 1968 U.S.Code Cong. & Admin.News 2613, 2626.

Further, Senator Wayne Morse, who was deeply involved in shaping the final version of the legislation, inserted a speech he had previously delivered to constituents into the *Congressional Record* which stated his understanding of the bill. "The language is so broad that it would, in effect, permit a Secretary of the Interior, as I said, to trade off even part of one park in a State to create another." 114 Cong.Rec. 11011

(April 30, 1968) (Sen. Morse).[16] Senator Morse was instrumental in getting a provision inserted in the bill which excluded timber lands harvested under a sustained yield program from federal lands which could be exchanged. *Id.* at 11009–11012. No such similar exclusion was made for park land. Therefore, it is reasonable to construe Congress' intent to allow park land to be exchanged under this provision. *See also Commonwealth of Pennsylvania v. Morton,* 381 F.Supp. 293, 298 (D.D.C. 1974).[17]

**B. 16 U.S.C. § 460*l*–9(c)**

In seeking relief before this Court, the plaintiffs rely on a 1977 amendment to the Land and Water Conservation Fund Act of 1965, *supra.* That amendment, 16 U.S.C. § 460*l*–9(c) ["§ 9(c)"], was enacted some nine years after § 22(b). The plaintiffs claim that the defendants have violated § 9(c) and that they are thus precluded by law from engaging in the exchange. Section 9(c) provides:

**(c) Boundary changes; donations**

Whenever the Secretary of the Interior determines that to do so will contribute to, and is necessary for, the proper preservation, protection, interpretation, or management of an area of the national park system, he may, following timely notice in writing to the Committee on Interior and Insular Affairs of the House of Representatives and to the Committee on Energy and National Resources of the Senate of his intention to do so, and by publication of a revised boundary map or other description in the Federal Register, (i) make minor revisions of the boundary of the area, and moneys appropriated from the fund shall be available for acquisition of any lands, waters, and interests therein added to the area by such boundary revision subject to such statu-

---

**16.** Senator Morse's statement was in the context of his attempt to persuade the Senate to insert the public hearing and timber land restriction provision in the bill.

**17.** The decision in *Morton* was announced in 1974, three years prior to the enactment of 16

U.S.C. § 460*l*–9(c). Therefore, the Court's citation of it is intended only to address the purpose of § 22(b) and does not address the issue of the interaction of § 22(b) and § 9(c). *See infra* at 21–29.

tory limitations, if any, on methods of acquisition and appropriations thereof as may be specifically applicable to such area: *Provided, however,* That such authority shall apply only to those boundaries established subsequent to January 1, 1965; and (ii) acquire by donation, purchase with donated funds, transfer from any other Federal agency, or exchange, lands, waters, or interests therein adjacent to such area, except that in exercising his authority under this clause (ii) *the Secretary may not alienate property administered as part of the national park system in order to acquire lands by exchange,* the Secretary may not acquire property without the consent of the owner, and the Secretary may acquire property owned by a State or political subdivision thereof only by donation. Prior to making a determination under this subsection, the Secretary shall consult with the duly elected governing body of the county, city, town, or other jurisdiction or jurisdictions having primary taxing authority over the land or interest to be acquired as to the impacts of such proposed action, and he shall also take such steps as he may deem appropriate to advance local public awareness of the proposed action. Lands, waters, and interests therein acquired in accordance with this subsection shall be administered as part of the area to which they are added, subject to the laws and regulations applicable thereto. (Latter emphasis added).

The purpose of the 1977 amendment was to establish "a special account to expeditiously acquire the backlog of lands previously authorized for inclusion in our national park system...." H.R.Rep. No. 156, 95th Cong., 1st Sess. 2 (1977). The amendment also included provisions to allow the Secretary of the Interior to make minor boundary changes in certain national parks and to accept qualifying land adjacent to a national park by donation. *Id.*

Section 9(c)(ii) permits the Secretary of Interior to acquire land adjacent to a national park by exchange, provided that "the Secretary may not alienate property administered as part of the national park system in order to acquire lands by exchange." That section prohibits the proposed exchange because of the unique geography of the land involved. Immediately adjacent to the Georgetown Waterfront Park authorized in 1984 is another unit of the national park system—Rock Creek and Potomac Parkway.[18] The body of water known as Rock Creek, national park property, is immediately adjacent to an interest in land which will be acquired by the federal government—the public access easement on the west bank of Rock Creek. *See* attached map, Exhibit 1. In order to obtain that interest in land, the government is exchanging national park service property, the restrictive height easement. Therefore, the proposed exchange violates the express caveat of § 9(c) that no park service property be exchanged to acquire land adjacent to a national park. The Court is faced with resolving the apparent conflict between the two statutes.

## C. § 9(c) is the Applicable Statute

The Court initially notes that the two statutes in this case are not in fact, inconsistent, *see infra* at 24–25, but only lend themselves to an apparent conflict with the unique set of facts here presented—where two national parks border each other and where the private land to be acquired within one park is situated exactly adjacent to the neighboring park. The Court's interpretation of the interplay of the two statutes is limited by the facts of this case. The defendants' view that the two statutes apply in two distinct geographic spheres, § 22(b) where land is acquired within a national park and § 9(c) where land is acquired adjacent to a national park, is generally the correct method to view a proposed exchange. However, where, as here, there is an intersection of the two spheres, the

---

**18.** The parties represented at the hearing that Rock Creek and Potomac Parkway technically encompasses Rock Creek, Rock Creek Park, and the road known as Rock Creek and Potomac Parkway.

Court must decide which statute is applicable.

■ Defendants initially argue that the March 9, 1984 opinion of the Office of the Solicitor of the Department of the Interior, approving the proposed exchange pursuant to § 22(b), is entitled to considerable deference by this Court. Federal Defendants' Motion for Summary Judgment at Exhibit 4. The Supreme Court has recently explained the standard of review that a court must give to an agency interpretation. The Court initially held that if the language of the statute is clear, the agency and the court must heed the specific language. *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* — U.S. —, — – —, 104 S.Ct. 2778, 2781–82, 81 L.Ed.2d 694 (1984). However, "if the statute is silent or ambiguous with respect to the specific issue, the question for the court is whether the agency's answer is based on a permissible construction of the statute." *Id.* 104 S.Ct. at 2782. The specific problem of the limited interplay between § 22(b) and § 9(c) is not addressed in the latter statute. Thus, this Court's review of the agency's determination is limited to determining whether the agency opinion was "reasonable." *Id.*[19] *Accord State of Montana v. Clark,* 749 F.2d 740, 745–46 (D.C.Cir.1984).

The Court finds that in light of the language of § 9(c), the agency's interpretation of the interaction between the two statutes was unreasonable.[20] The agency opinion concluded:

> We have also reviewed the applicability of the provisions of 16 U.S.C. § 406*l* –9(c)

**19.** The reasonableness standard, as opposed to the arbitrary or capricious standard, is employed where the delegation to the agency to interpret an ambiguous statute is implicit rather than explicit. *Chevron, U.S.A.,* 104 S.Ct. at 2782. *Accord State of Montana v. Clark,* 749 F.2d 740, 745–46 (D.C.Cir.1984).

**20.** Although containing the same interpretive error concerning the view of § 9(c) as only a boundary modification provision, even the Department of the Interior, at one time, recognized that the *effect* of the exchange must be examined to determine the applicable statute.

(1982). This is a limited exchange authority involving the expansion of boundaries established by legislation subsequent to January 1, 1965. This authority is not applicable to the proposed exchange. The proposed exchange does not involve a change in boundaries of a specific park unit established subsequent to January 1, 1965 for the purposes specified in § 460*l* –9(c). Rather, as indicated above, the exchange involves establishing new park areas under the authorities unique to units of the National Park System within the District of Columbia. For exchanges such as are involved here, the broader provisions of 16 U.S.C. 460*l* –22(b) are applicable. 16 U.S.C. 460*l* –22(b) was not repealed by implication upon the passage of 16 U.S.C. 460*l* –9(c).

Exhibit 4, *supra,* at 3–4.

The agency's decision was based on a clearly erroneous interpretation of § 9(c). The agency held that § 9(c) was not applicable to the proposed exchange because it is only a provision dealing with the change of park boundaries in parks established after January 1, 1965. The agency was apparently examining clause (i) of § 9(c) which deals with boundary changes. This is especially evident by the agency's use of the 1965 date. That date affects only clause (i) because of its placement in the statute. " '[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.' " *Russello v. United States,* 464 U.S. 16, —, 104 S.Ct. 296, 300, 78 L.Ed.2d 17 (1983) (*quot-*

> *If the effect of the exchange* is to create a boundary modification, the more stringent requirements of the 1977 amendments apply. However, if the exchange does not involve a boundary revision, section 460*l* –22(b) authorizes the exchange of park lands for private lands.

August 2, 1978 Letter from the Office of the Solicitor, Department of Interior to Director, NPS, Defendant-Intervenors' Motion for Summary Judgment, Exhibit G at 5. (emphasis added).

*ing United States v. Wong Kim Bo*, 472 F.2d 720, 722 (5th Cir.1972)). *Accord Persinger v. Islamic Republic of Iran*, 729 F.2d 835, 843 (D.C.Cir.1984). Further, the plain language of § 9(c) is such that the boundaries clause is separate from the adjacent land clause. *Cf. American Tobacco Co. v. Patterson*, 456 U.S. 63, 68, 102 S.Ct. 1534, 1537, 71 L.Ed.2d 748 (1982) (plain language of a statute is conclusive absent expressed contrary legislative intent). The legislative history reinforces Congress' intent that the two clauses of § 9(c) be read separately. The Senate Report on the bill distinguishes between the two clauses when it lists the Secretary's authority to make boundary changes *and* to accept adjacent land as separate powers. S. Rep. No. 162, 95th Cong., 1st Sess. 6, *reprinted in* 1977 U.S.Code Cong. & Admin.News 322, 326. *See also* 123 Cong.Rec. 16689 (May 25, 1977) (Rep. Burton) (listing the *separate* amendments to the legislation). Thus, the agency's interpretation of § 9(c) is not conclusive because it is not reasonable.

■ In determining which statute controls the proposed exchange, the Court is guided by the general principle of statutory construction that it should " 'find that interpretation which can most fairly be said to be imbedded in the statute, in the sense of being most harmonious with its scheme and with the general purposes that Congress manifested.' " *Commissioner of Internal Revenue v. Engle*, 464 U.S. 206, ——, 104 S.Ct. 597, 604, 78 L.Ed.2d 420 (1984) (*quoting NLRB v. Lion Oil Co.*, 352 U.S. 282, 297, 77 S.Ct. 330, 338, 1 L.Ed.2d 331 (1957) (Frankfurter, J., concurring in part and dissenting in part)). At the recent motions hearing, plaintiffs argued that § 9(c) could be viewed as a repeal by implication of § 22(b)'s authority to exchange park land. Plaintiffs, however, further argued that if § 22(b) permitted exchange of park land, that was a repeal by implication of the Organic National Park Service Act of 1916, 16 U.S.C. § 1 *et seq.* These views are rejected.

■ Implied repeals are generally disfavored by courts. *See, e.g., St. Martin Evangelical Lutheran Church v. South Dakota*, 451 U.S. 772, 787–88, 101 S.Ct. 2142, 2150–2151, 68 L.Ed.2d 612 (1981); *Morton v. Mancari*, 417 U.S. 535, 549, 94 S.Ct. 2474, 2482, 41 L.Ed.2d 290 (1974); *Executive Limousine Service, Inc. v. Goldschmidt*, 628 F.2d 115, 120 (D.C.Cir. 1980). It is not necessary to accept the plaintiffs' argument that § 9(c), in effect, revoked NPS' authority contained in § 22(b) to exchange park land. Rather, § 22(b) states that before the Secretary may convey federal property, he or she must determine that it "is suitable for exchange." 16 U.S.C. § 460*l*–22(b). If the exchange has the effect of triggering § 9(c) because the land received is adjacent to a national park, then the park land is no longer "suitable for exchange." This comports with the maxim of statutory construction "that statutory provisions, whenever possible, should be construed so as to be consistent with each other." *Citizens to Save Spencer County v. United States Environmental Protection Agency*, 600 F.2d 844, 870 (D.C.Cir.1979). Moreover, this interpretation ensures "that the maximum possible effect should be afforded to all statutory provisions, and, whenever possible, none of those provisions rendered null or void." *Id.*

■ The determination that § 9(c) precludes the proposed exchange is supported by the congressional declaration of policy behind national park service legislation, 16 U.S.C. § 1 *et seq.*, and by the history of the restrictive height easement on Parcel G. In a recent congressional document, Staff of House Comm. on Interior and Insular Affairs, 98th Cong., 2d Sess., *Land Acquisition Policy and Program of the National Park Service*, (Comm. Print 1984), basic issues of park land acquisition were examined.

> [O]ne cannot address acquisition issues, without looking at the fundamental purpose of the National Park System itself. Under the so-called Organic Act of 1916 which established the National Park Ser-

vice, the Congress said that the purpose of the parks is 'to conserve the scenery and the natural and historic objects and the wildlife therein and to provide for the enjoyment of the same in such manner and by such means as will leave them unimpaired for the enjoyment of future generations.'

*Id.* at 26 (*quoting* 16 U.S.C. § 1).

Since the purpose of the 1916 Organic Act is to protect and conserve *all* park land, the interests of the neighboring national park, Rock Creek and Potomac Parkway, must weigh heavily in determining the applicable statute. The history of the government's interest in obtaining the restrictive easement is such that it was obtained for the express purpose of protecting the view from Rock Creek and Potomac Parkway. Plaintiffs have submitted a March 21, 1985 affidavit of John Nolen, Jr., Director of Planning at the National Capital Park and Planning Commission ("NCP & PC")[21] when the easement was obtained. He stated that two tall cement elevators were located on Parcel G at the time that the C & O Canal, with the exception of 19 parcels, was sold to the United States. Nolen Aff. at ¶¶ 8–10. The government found the elevators to be intrusive on the Parkway and eventually it was able to negotiate the restrictive easement to protect the view and to protect adjacent Rock Creek Park. The agreement contained the concession that the easement would not be effective in the first two years after the deed was signed. The deed was eventually signed in 1941. Nolen Aff. at ¶¶ 12–14. Mr. Nolen concludes in his affidavit that "[t]he covenant restricting the height of any construction to *ground level uses* was a fortuitous answer to the threat of any intrusive usages at the junction of two major elements of the park system of the nation's capital, *i.e.*, the C & O Canal and the Rock Creek and Potomac Parkway." *Id.* at ¶ 16 (emphasis in original). Further, at the January 17, 1984 hearing, John Parsons of NPS, stated "that the intent of [the 1941] agreement

was to restrict building heights adjacent to park lands, adjacent to Rock Creek Park, as well as what was then the remnants of the C & O Canal." Plaintiff's Motion for Summary Judgment, Exhibit C at 5. He also stated that the thrust of restrictive height easements was "to protect park resources." *Id.* Section 9(c) directly addresses the issue of adjacent park land; thus its application to the proposed exchange is in keeping with the philosophy of park service legislation and the policy behind the initial acquisition of the restrictive easement on Parcel G.

Defendants, however, contend that the proposed exchange is more attune with the Organic Act in that they claim the net effect of the exchange will be to provide more general access to the Georgetown Waterfront area through the scenic and public access easements. However, there have been recent indications that Congress prefers the practice of purchasing land rather than alternative methods such as easements or land exchanges. *See, e.g.,* House Comm. on Interior and Insular Affairs, *Land Acquisition Policy* at 6–7, 26 (Comm. Print 1984). The Committee noted problems associated with easements such as the cost of monitoring and enforcing them and their decreased effectiveness over time. *Id.* at 29–30. The Secretary of the Interior's unwillingness to purchase the private property on the Georgetown Waterfront (perhaps due to lack of funds), and thus the resort to a "second best" option, will not cure the legal defect inherent in the exchange.

Moreover, the proposed development of the private property within the Georgetown Waterfront Park is directly contrary to congressional policy. Defendants have placed themselves in a difficult dilemma in that a national park, which encompasses the WHA private property, was created in order to cause the exchange to fall within § 22(b). Yet, Congress has repeatedly re-

---

**21.** NCP & PC is a forerunner of the National Capital Planning Commission. Mr. Nolen served NCP & PC for more than 20 years in several important capacities, including City Planner, Director of Planning, and Director.

affirmed its intention that the amendments to the Land and Water Conservation Fund Act of 1965 be used to further the goal of acquiring all private inholdings within national parks. *See, e.g.,* S.Rep. No. 162, 95th Cong., 1st Sess. 6, *reprinted in* 1977 U.S.Code Cong. & Admin.News 322, 326 ("the committee clearly recognizes that the intent of Congress is to eventually acquire all inholdings located in the national park system"); 123 Cong.Rec. 16690 (May 25, 1977) (Rep. Sebelius) (the 1977 amendments were necessary "to promptly eliminate the adversity of private inholdings within the public's national park areas…"). The government's facilitation of the development of a hotel and office complex within a national park effectively eliminates that goal because the cost of eventually acquiring the inholding would be prohibitive. During the debate on the 1977 amendments, a member of Congress commented that after acquiring developed inholdings in national parks "the Government should plan to remove the structures and development in a reasonably expeditious manner." 123 Cong.Rec. 10205 (April 4, 1977) (Rep. Sebelius).

The existence of 16 U.S.C. § 460*l*–9(c) and the particular facts of this case compel the conclusion that the government's restrictive height easement on Parcel G is not "suitable for exchange" within the authority of 16 U.S.C. § 460*l*–22(b). That exchange must, therefore, be enjoined.