777 F.2d 711
 250 U.S.App.D.C. 52
 COMMITTEE OF 100 ON the FEDERAL CITY, et al.
v.
Donald P. HODEL, Secretary of Interior, et al.
Washington Harbour Associates, Appellant.
COMMITTEE OF 100 ON the FEDERAL CITY, et al.
v.
Donald P. HODEL, Secretary of Interior, et al., Appellants.
COMMITTEE OF 100 ON the FEDERAL CITY, et al.
v.
Donald P. HODEL, Secretary of Interior, et al.,
Rosewood Hotels, Inc., Appellant.
 Nos. 85-5689 to 85-5691.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Oct. 1, 1985.
Decided Nov. 8, 1985.
As Amended Nov. 8, 1985.
 
 Appeals from the United States District Court for the District of Columbia (Civil Action No. 85-00059).
 Mitchell R. Berger, Asst. U.S. Atty., with whom Joseph E. diGenova, U.S. Atty., Royce C. Lamberth and R. Craig Lawrence, Asst. U.S. Attys., Washington, D.C., were on brief, for appellants, Donald P. Hodel, Secretary of the Interior, et al., in No. 85-5690.
 Irwin Goldbloom, with whom William C. Kelly, Jr., David H. Schwartz, Washington, D.C., Robert J. Kheel, New York City, and S. Scott Morrison, Washington, D.C., were on joint brief, for appellants, Washington Harbour Associates, and Rosewood Hotels, Inc., in Nos. 85-5689 and 85-5691.
 Cornish F. Hitchcock, with whom Alan B. Morrison, Washington, D.C., was on brief, for appellees, Committee of 100 on the Federal City, et al., in Nos. 85-5689, 85-5690 and 85-5691.
 Before ROBINSON, Chief Judge, and BORK, Circuit Judge, and McGOWAN, Senior Circuit Judge.
 Opinion for the Court filed by Senior Circuit Judge McGOWAN.
 McGOWAN, Senior Circuit Judge:
 
 
 1
 These consolidated appeals present the question of which statute, either 16 U.S.C. Sec. 460l -9(c) (1982) ("Sec. 9(c)") or 16 U.S.C. Sec. 460l -22(b) (1982) ("Sec. 22(b)"), controls where the National Park Service ("Park Service") seeks to exchange a piece of national park property for other property which is within a national park but which also happens to be adjacent to another national park. The pivotal importance of these two provisions to the disposition of this case requires that we set forth their terms in full at the outset of our opinion. Section 9(c) provides:
 
 
 2
 Whenever the Secretary of the Interior determines that to do so will contribute to, and is necessary for, the proper preservation, protection, interpretation, or management of an area of the national park system, he may, following timely notice in writing to the Committee on Interior and Insular Affairs of the House of Representatives and to the Committee on Energy and Natural Resources of the Senate of his intention to do so, and by publication of a revised boundary map or other description in the Federal Register, (i) make minor revisions of the boundary of the area, and moneys appropriated from the fund shall be available for acquisition of any lands, waters, and interests therein added to the area by such boundary revision subject to such statutory limitations, if any, on methods of acquisition and appropriations thereof as may be specifically applicable to such area: Provided, however, That such authority shall apply only to those boundaries established subsequent to January 1, 1965; and (ii) acquire by donation, purchase with donated funds, transfer from any other Federal agency, or exchange, lands, waters, or interests therein adjacent to such area, except that in exercising this authority under this clause (ii) the Secretary may not alienate property administered as part of the national park system in order to acquire lands by exchange, the Secretary may not acquire property without the consent of the owner, and the Secretary may acquire property owned by a State or political subdivision thereof only by donation. Prior to making a determination under this subsection, the Secretary shall consult with the duly elected governing body of the county, city, town, or other jurisdiction or jurisdictions having primary taxing authority over the land or interest to be acquired as to the impacts of such proposed action, and he shall also take such steps as he may deem appropriate to advance local public awareness of the proposed action. Lands, waters, and interests therein acquired in accordance with this subsection shall be administered as part of the area to which they are added, subject to the laws and regulations applicable thereto.
 
 Section 22(b) provides:
 
 3
 The Secretary of the Interior is authorized to accept title to any non-Federal property or interest therein within a unit of the National Park System or miscellaneous area under his administration, and in exchange therefor he may convey to the grantor of such property or interest any Federally-owned property or interest therein under his jurisdiction which he determines is suitable for exchange or other disposal and which is located in the same State as the non-Federal property to be acquired: Provided, however, that timber lands subject to harvest under a sustained yield program shall not be so exchanged. Upon request of a State or a political subdivision thereof, or of a party in interest, prior to such exchange the Secretary or his designee shall hold a public hearing in the area where the lands to be exchanged are located. The values of the properties so exchanged, either shall be approximately equal, or if they are not approximately equal, the values shall be equalized by the payment of cash to the grantor from funds appropriated for the acquisition of land for the area, or to the Secretary as the circumstances require.
 
 
 4
 We hold that Sec. 22(b) controls in these circumstances. We therefore reverse the order of the district court, which granted summary judgment to the plaintiffs and entered a permanent injunction against the proposed exchange of property. Committee of 100 on the Federal City v. Hodel, 611 F.Supp. 547 (D.D.C.1985). Although the district court did not reach the issue, we further hold that the "public hearing" requirement of Sec. 22(b) does not require the Park Service to conduct any further hearings in this case and that the Park Service conclusion that the two properties were "approximately equal in value," as required by Sec. 22(b), was reasonable.
 
 I. BACKGROUND
 A. The Proposed exchange
 
 5
 The Georgetown waterfront is located between Key Bridge and Rock Creek in the District of Columbia. Ownership of the land in this area is distributed among several entities. Immediately to the east of the area is the Rock Creek and Potomac Parkway, a national park. On the west bank of Rock Creek, Washington Harbour Associates ("WHA"), one of the appellants, owns three lots of private property. The United States, in a 1938 deed, acquired rights over 1.21 acres of this land. These rights, which the parties refer to as an "easement," limit building heights on this property to 20 feet or one story. The Park Service controls the various properties held by the United States in the waterfront area, including these easement rights.
 
 
 6
 On the portion of its property which is not subject to this easement, WHA has commenced an extensive development project (referred to as "Phase I"). In addition, WHA proposes a "Phase II," including the construction of a high-rise office and hotel complex in excess of 50 feet in height on the land which is subject to the 20 foot height easement. Rosewood Hotels, Inc. ("Rosewood") has a contract with WHA to purchase the Phase II land in order that it may construct the hotel and office building.
 
 
 7
 In 1983, WHA entered negotiations with the Park Service. WHA proposed that the Park Service surrender its 20 foot height easement. In exchange, WHA would give the United States title to scenic and access easements, including an easement along the west bank of Rock Creek, an access easement along the Potomac River, and a scenic easement along Thomas Jefferson Street, which runs through the middle of the Phase I site. WHA also offered to make landscape improvements along the east bank of Rock Creek, as well as on federal property south of the Phase II site.
 
 
 8
 In December 1983, the Park Service described the proposal in an Environmental Assessment, which suggested that the proposed property exchange was desirable. On January 17, 1984, the Park Service held a hearing for the purpose of receiving comments on the Environmental Assessment. Based in part on these public comments, the Park Service rejected WHA's preliminary offer.
 
 
 9
 After further negotiations, WHA and the Park Service reached agreement on a revised proposal, which would lower the height of one of the buildings. WHA also agreed to make further landscaping improvements, coupled with perpetual maintenance of those areas, to donate one million dollars for development of a park along the Potomac waterfront, to repair a seawall, and to renovate the tidelock of the C & O Canal. These new items were described in a revised Environmental Assessment, which was publicly released in April of 1984.
 
 
 10
 In June and July of 1984, further hearings on the proposed exchange were held before various local and national agencies, including the Old Georgetown Board of the Commission of Fine Arts, the C & O Canal Advisory Commission, the D.C. Historic Preservation Review Board, and the National Capital Planning Commission ("NCPC"). WHA received approval for its development plans from each of these government agencies. In particular, in August of 1984, NCPC, which has authority to set the boundaries of national parks within the District of Columbia,[1] voted to designate land between Rock Creek and the Key Bridge as a national park, to be known as the "Georgetown Waterfront Park."In early 1984, the Park Service began the process of appraising the relative values of the properties which the developer proposed to exchange. In January of 1984, WHA provided the Park Service with initial estimates of the value of the easement interests to be conveyed. The Park Service reviewed that estimate and returned it to WHA for consideration of additional issues. WHA submitted revisions to this appraisal in May of 1984. Although the Park Service disagreed with the appraiser's approach, it also concluded that the available data would show that the proposed exchange would meet the "of approximately equal value" standard embodied in Sec. 22(b). On July 20, 1984, WHA submitted its final appraisal. The Park Service evaluated this appraisal and concluded that the net benefit to the Park Service would be no less than $102,144, exclusive of the value of maintenance interests conveyed and the value of a park development included in the deal.
 
 
 11
 On July 2, 1984, counsel for three of the appellees wrote to the Park Service, asking for a public hearing on the value of the interests being exchanged. This letter also requested that the Park Service make available to the public prior to such hearing the appraisals upon which it relied. The Park Service rejected this request.
 
 
 12
 On October 16, 1984, the Park Service formally announced its decision to proceed with the exchange of properties. A deed transferring the interests was signed on January 7, 1985, but was placed in escrow pending satisfaction of certain preconditions.
 
 B. The district court proceedings
 
 13
 Plaintiffs in this action are several citizen groups, Committee of 100 on the Federal City, the Human Environmental Center, the Environmental Policy Institute, and the Committee for Washington's Riverfront Parks (referred to collectively herein as "plaintiffs," "appellees" or the "citizens groups"). Plaintiffs filed their complaint on January 8, 1985. Their complaint named as defendants the Secretary of the Interior, the Director of the National Park Service, and the Regional Director of the National Capital Region of the National Park Service. These defendants will be referred to herein as "defendants" or "appellants." WHA and Rosewood also intervened as defendants in the case. These defendants will be referred to by name or as "intervenors."
 
 
 14
 The complaint challenged the proposed exchange under various provisions of the Land and Water Conservation Fund Act of 1965, as amended, 16 U.S.C. Sec. 460l -4 et seq. (1982). Specifically, plaintiffs contended that the exchange was barred by Sec. 9(c) of the statute, because in the proposed exchange the Park Service would acquire property adjacent to a national park and would give up national park property in return. Alternatively, plaintiffs argued that, even if Sec. 9(c) did not apply, and the exchange was authorized by Sec. 22(b), a remand to the agency was necessary because the Park Service had failed to hold a public hearing as required by Sec. 22(b), and the Park Service had failed to give the public an opportunity to review and comment on the evidence presented by the developer before the Park Service determined that the properties were of approximately equal value, as also required by Sec. 22(b).
 
 
 15
 The Park Service moved to dismiss the case because of plaintiffs' alleged lack of standing or, in the alternative, for summary judgment. WHA and Rosewood filed a separate motion for summary judgment. Plaintiffs thereafter also moved for summary judgment.
 
 
 16
 In a memorandum opinion and accompanying order dated May 30, 1985, the district court granted plaintiffs' motion for summary judgment and denied defendants' and intervenors' motions. Committee of 100 on the Federal City v. Hodel, 611 F.Supp. 547 (D.D.C.1985). The district court ordered the federal defendants to take all necessary steps to void the deed dated January 7, 1985 and to reinstate title to the 20 foot easement in the United States. Order, J.A. at 87.
 
 
 17
 The district court reasoned in three parts. First, the court held that plaintiffs had standing to bring their challenge to the proposed exchange. Committee of 100, 611 F.Supp. at 553. That holding is not challenged before this court. Second, the court held that both Sec. 9(c) and Sec. 22(b) applied to the proposed exchange. To reconcile the apparent conflict between these two provisions, and to give maximum effect to each provision, the court held that, since the exchange triggered Sec. 9(c), the park land given up was not "suitable for exchange" as required by Sec. 22(b). Id. at 558. Finally, because the court concluded that the proposed exchange was void, it did not address the question whether, if Sec. 22(b) authorized the exchange, Sec. 22(b) nevertheless required a public hearing on the issue of whether the properties were "approximately equal in value," and the question of whether the Park Service reasonably concluded that the properties, in fact, were "approximately equal in value." Id. at 554 nn. 14-15.
 
 II. ANALYSIS
 A. The statutory conflict
 
 18
 To begin to determine whether Sec. 9(c) or Sec. 22(b) controls this case, one must first conceptualize the problem. The following diagram, which was used by both appellants and appellees at oral argument, presents a good picture of the problem.
 
 
 19
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 
 20
 As can be observed from the diagram, the problem in this case is unique. If the Rock Creek and Potomac Parkway national park did not exist, this case would clearly be controlled by Sec. 22(b). That is, the property acquired is within a unit of the national park system (Georgetown Waterfront Park), and the property exchanged is Federally-owned property which is located in the same State (the District of Columbia for these purposes is a State). Conversely, if the Georgetown Waterfront Park did not exist, then this case would be controlled by Sec. 9(c). That is, the property to be acquired is adjacent to a national park area (Rock Creek and Potomac Parkway), and the property alienated by the Park Service is part of the national park system (since it has always been administered by the Park Service).
 
 
 21
 With this summary of the situation in mind, the question for our resolution becomes a straightforward one: does Sec. 9(c) prohibit the proposed exchange? The focus of the dispute is on the meaning of Sec. 9(c) because, if we determine that Congress did not intend Sec. 9(c) to apply in this situation, then Sec. 22(b) controls, and the proposed exchange may go forward (if no other restrictions apply).
 
 
 22
 We begin our analysis, as we must in all cases involving questions of congressional intent, with the text and plain meaning of the statute. Section 9(c) generally concerns boundary changes. The section is so labelled. The introductory clause in the section states that the Secretary must give notice to Congress and publish a revised boundary map before taking action under the section. Clause (i) of the section expressly states that the Secretary may "make minor revisions of the boundary of the area." While clause (ii), the clause at issue here, does not expressly state that it concerns boundary changes, it does state that the Secretary may "acquire by donation, purchase with donated funds, transfer from any other Federal agency, or exchange, lands, waters, or interests therein adjacent to such area." That Congress was concerned, in clause (ii), with the acquisition of property "adjacent to" a national park comports with the view that Sec. 9(c) as a whole concerns changes in the boundaries of national parks. Finally, the section concludes with the requirement that "[l]ands, waters, and interests therein acquired in accordance with this subsection shall be administered as part of the area to which they are added, subject to the laws and regulations applicable thereto." This portion of the section as well suggests that Congress was concerned with boundary changes, i.e., that when property was added to a national park (and, hence, boundaries were changed), the new property would be administered as part of the park to which it was added.[2]
 
 
 23
 The conclusion that Sec. 9(c) only operates where boundary changes are contemplated is a critical one for our purposes. Appellees essentially concede that the proposed exchange does not change the boundaries of either the Rock Creek and Potomac Parkway or the Georgetown Waterfront Park. Instead, appellees' position is that the literal terms of Sec. 9(c) apply to this case: the property acquired is adjacent to an area of the national park system, and the property relinquished is property administered as part of the national park system. See Br. for Appellees at 27. If we accept the view that Sec. 9(c) only applies to proposed boundary changes, however, then Sec. 9(c) does not control this case, despite appellees' reading of its terms.
 
 
 24
 If the plain words of the statute were the only guide to congressional intent in this case, we might hesitate to accept the conclusion that Sec. 9(c) only applies to proposed boundary changes. The legislative history of Sec. 9(c), however, removes any remaining doubt as to the meaning of that section.
 
 
 25
 Historically, Congress has reserved for itself the function of setting the boundaries of national parks. See, e.g., 16 U.S.C. Sec. 21a (1982) (revising boundaries of Yellowstone National Park); 16 U.S.C. Sec. 45a (1982) (revising boundaries of Sequoia National Park); 16 U.S.C. Sec. 79b (1982) (setting boundaries of Redwood National Park). In enacting Sec. 9(c), Congress appears to have created a limited exception to that policy. Section 9(c) was proposed in the House of Representatives as one of several amendments to the Land and Water Conservation Fund Act of 1965. 123 Cong.Rec. 10203-04 (text of bill) (1977). The Senate, however, proposed to delete the section. The Senate Report stated that its amendment deleting the section "reaffirms the view that Congress intends to retain the prerogative to set and define the boundaries of units in the national park system." S.Rep. No. 95-162, 95th Cong., 1st Sess. 6 (1977), U.S.Code Cong. & Admin.News 1977, pp. 322, 326. Eventually, however, Sec. 9(c) was restored as a result of legislative compromise.
 
 
 26
 The history of the enactment of Sec. 9(c) also suggests that Congress did not intend, in this section, to restrict prior authority given to the Park Service to acquire property by exchange. Specifically, in various discussions and documents related to the enactment of Sec. 9(c), there is apparently no discussion of Sec. 22(b). If Congress had intended, in enacting Sec. 9(c), to restrict the authority of the Park Service to carry out exchanges of property within the national parks, presumably it would have mentioned specific prior authorizations of such exchanges. Section 22(b), enacted in 1968, which grants the Park Service authority to acquire property within a national park in exchange for other federal land, was certainly well-known to the relevant congressional actors. Indeed, what little evidence there is suggests that Congress intended Sec. 9(c) to serve as new authority for the Park Service, not to restrict its prior authority. See, e.g., S.Rep. No. 95-162, 95th Cong., 1st Sess. 2 (1977) (referring to "new authority" provided in section); H.R.Rep. No. 95-156, 95th Cong., 1st Sess. 5 (1977) (referring to "limited additional authority").
 
 
 27
 Also consistent with the view that Congress did not intend, in enacting Sec. 9(c), to restrict prior authorizations for property exchanges (including Sec. 22(b)) is the fact that the Department of the Interior was involved in drafting both sections. See S.Rep. No. 95-162, 95th Cong., 1st Sess. 10-13 (1977); S.Rep. No. 1071, 90th Cong., 2d Sess. 11-16 (1968), U.S.Code Cong. & Admin.News 1968, p. 2613. The Interior Department apparently saw no conflict between the wording of these two provisions. Indeed, in a letter from the Department's Assistant Secretary to Representative John Sieberling, Chairman of the Subcommittee on Public Lands and National Parks of the House Committee on Interior and Insular Affairs, one of the congressional officials who would have a hand in drafting pertinent statutes in this area, the Assistant Secretary mentioned this precise problem. The Assistant Secretary stated that, as to the new provision, now Sec. 9(c), "[t]his language relates, in our view, to the acquisition of land directly associated with minor boundary revisions. It follows, that the restriction on alienation of park lands relates to exchanges associated with boundary adjustments, not generic exchanges under the 1968 amendments [including Sec. 22(b) ]." Joint Appendix ("J.A.") at 223. That the Interior Department proposed, and that Congress has apparently accepted, the view that Sec. 9(c) does not restrict the Department's authority to operate where Sec. 22(b) applies, is additional support for our conclusion that Sec. 9(c) does not control in this case.
 
 
 28
 Our conclusion in this regard is only partially divergent from that of the district court. The district court noted that, if Sec. 9(c) did not apply, then Sec. 22(b) would authorize the proposed exchange in this case. Committee of 100, 611 F.Supp. at 554-55. The district court also concluded that the view that the two statutes apply in two distinct geographic spheres "is generally the correct method to view a proposed exchange." Id. at 556. The district court erred, however, in rejecting the Park Service conclusion that Sec. 9(c) applies only to changes in park boundaries, and thus did not control in this case. See id. at 557-58. The district court was also concerned that both statutes be given maximum effect. The district court held, therefore, that " '[i]f the exchange has the effect of triggering Sec. 9(c) because the land received is adjacent to a national park, then the park land is no longer 'suitable for exchange' [as required by Sec. 22(b) ]." Id. at 558. Because Sec. 9(c) does not apply to this case, we find that this attempted reconciliation was unnecessary. We may therefore return to the district court's initial conclusion that Sec. 9(c) and Sec. 22(b) operate in separate geographic spheres.
 
 
 29
 Our decision to reverse the district court order on the question whether Sec. 9(c) prohibits the proposed exchange does not complete our analysis. Both appellants and appellees urge the court to address two additional issues. The district court declined to address these issues because of its initial determination on the Sec. 9(c) issue. These additional questions do not turn on any unresolved factual issues. In the interest of economy, we exercise our discretion to consider these questions immediately. See Singleton v. Wulff, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976); United States v. Jones, 527 F.2d 817, 819 (D.C.Cir.1975).
 
 B. The hearing requirement of Sec. 22(b)
 
 30
 In addition to authorizing the Secretary to acquire property within a national park in exchange for other Federal property, Sec. 22(b) imposes a hearing requirement: "Upon request of a State or a political subdivision thereof, or of a party in interest, prior to such exchange the Secretary or his designee shall hold a public hearing in the area where the lands to be exchanged are located." The Park Service held a hearing on this proposed exchange in January of 1984. This hearing concentrated on issues raised by the Environmental Assessment, which had described the proposed exchange. See 48 Fed.Reg. 55643 (Dec. 14, 1983) (notice of proposed exchange of interests). Appellees insist, however, that the Sec. 22(b) hearing provision requires more. Section 22(b) also provides that "[t]he values of the properties so exchanged, either shall be approximately equal, or if they are not approximately equal, the values shall be equalized by the payment of cash...." Appellees assert that the Park Service has violated Sec. 22(b) by failing to hold an additional hearing on whether the properties involved in this case are "approximately equal" in value. See Br. for Appellees at 47. We hold, however, that no additional hearing is required.
 
 
 31
 The plain words of the statute do not state exactly what must be considered at the public hearing. That the hearing requirement precedes the requirement that the properties be approximately equal in value might suggest that the hearing would not consider that additional issue. Mindful of the possibility that the placement of these two requirements is merely accidental, however, we press on to discover further indications of legislative intent.
 
 
 32
 There are two relatively clear indications in the legislative history that the public hearing requirement of Sec. 22(b) was not intended to apply to the question of approximately equal value. First, there is no reference in the legislative history to a specific connection between these two requirements. As first proposed, a hearing provision was required, not to force any more precise comparison of economic values, but to retain a check on the exercise of the Secretary's discretion. See 114 Cong.Rec. 10626 (1968) (statement of Senator Morse). Senator Morse, who first raised the issue, was concerned that the Secretary might decide to exchange some property without first having heard from the members of the community who used the property. In terms of his own state (Oregon), Senator Morse publicly worried, "I can just hear the cattlemen or businessmen over there, expressing great concern that they have not been given a voice in an administrative hearing, before the exchange is consummated by the Secretary of the Interior, turning public land [e.g., grazing or timber land] into private land." 114 Cong.Rec. 11010 (1968). Senator Morse went on: "It seems to me that some opportunity should be given these people and these communities to explain their interest in Federal property before it is exchanged." Id. These materials strongly suggest that the public hearing referred to in Sec. 22(b) was intended to explore whether the property to be given up was "suitable for exchange," not whether it was "approximately equal" in value to the property acquired.
 
 
 33
 Second, the main advocate of a hearing requirement, Senator Morse, contemplated that such a hearing would take place early in the decision process. See 114 Cong.Rec. 10627 (1968) (statement of Senator Morse) ("[E]arly and complete local discussion of possible land exchanges is most desirable."); 114 Cong.Rec. 11010 (1968) ("The most reasonable way to [provide a set of standards for the Secretary] is to provide that when an exchange is deemed desirable, the Department, by public hearing and review, classify lands by use to determine those lands most suitable for exchange."). The idea of holding hearings as early as possible would make no sense if the public hearing were intended to consider whether the value of the two pieces of property were approximately equal in value. That decision, as appellees vigorously assert, requires review of appraisals from experts; such reports can take many months to prepare. It is apparent, therefore, that the Congress intended to provide a mechanism, early on in the process, for citizens to express their views on the value of the property that would be surrendered in the proposed exchange; the precise details of the economics of the exchange were not the focus of congressional concern. See id. ("This proceeding would enable local communities to make their case as to the value--or lack of value--to them of adjacent public timber, range land, or other public domain.").
 
 
 34
 C. Reasonableness of "approximately equal" value determination
 
 
 35
 Apart from the contention that the Park Service erred by failing to hold a public hearing on the question of whether the properties to be exchanged were approximately equal in value, appellees also advance the argument that the Park Service's determination that the properties were, in fact, approximately equal in value, was flawed. Appellees contend that it was "arbitrary and capricious," and therefore a violation of the Administrative Procedure Act, 5 U.S.C. Sec. 706(2)(A) (1982), for the Park Service: 1) To refuse plaintiff's request to make public the appraisals on which the Park Service would rely until after it formally announced its decision to approve the exchange, Br. for Appellees at 60, and 2) To have gone on the public record at the June 28, 1984 National Capital Planning Commission hearing as having approved the proposal, before the Park Service had made a final review of the appraisals. Id. at 61. We consider each of these contentions in turn.
 
 
 36
 Appellees' first contention rests on the view that the public was entitled to see and comment on the appraisals of the properties before the Park Service made its determination that the properties were approximately equal in value and that the exchange could go forward. We have already determined, however, that the public hearing requirement of Sec. 22(b) does not apply to the Park Service's determination as to whether the properties are approximately equal in value. Where no public hearing is required, the APA generally does not require an agency to expose its administrative workings prior to a final decision. Moreover, we can perceive nothing in the administrative record to dissuade us from the view that the Park Service has reasonably concluded that the properties are of approximately equal value.[3] Appellees' first contention must therefore fall.
 
 
 37
 Appellees also contend that the Park Service erred by publicly endorsing the proposed property exchange before it had completed its appraisal process. At the June 28, 1984 meeting of the District of Columbia Commission of Fine Arts, Mr. John Parsons, representing the Park Service, appeared and testified in support of the proposal:
 
 
 38
 You will recall at the last meeting that I spoke to you with some degree of hesitancy about our support and opinion. That is due to the fact that we were still in the middle of a public hearing process. Since that time we have worked with Washington Harbour Associates to respond not only to the comments of this Commission but the comments we received during our public hearing process.
 
 
 39
 I think what you are about to see is a vast improvement. We have gone through the numerous processes that we have to go through and determined that we believe this is in the best public interest and we are here in support, and indeed as a co-applicant. The project cannot move forward without our participation.
 
 
 40
 I know there was concern on the part of the Commission if we were getting half pregnant or whatever the term was. We are in total support of the project and hope you will look favorably on it.
 
 
 41
 J.A. at 331. We view this single incident as no indication that the Park Service had unfairly prejudged the question of whether the properties were approximately equal in value.
 
 
 42
 An administrative official is presumed to be objective and "capable of judging a particular controversy fairly on the basis of its own circumstances." United States v. Morgan, 313 U.S. 409, 421, 61 S.Ct. 999, 1004, 85 L.Ed. 1429 (1941). This court has questioned an agency decisionmaker only when his public statements about pending cases revealed that he " 'has in some measure adjudged the facts as well as the law of a particular case in advance of hearing it.' " Cinderella Career & Finishing Schools, Inc. v. FTC, 425 F.2d 583, 591 (D.C.Cir.1970) (quoting Gilligan, Will & Co. v. SEC, 267 F.2d 461, 469 (2d Cir.), cert. denied, 361 U.S. 896, 80 S.Ct. 200, 4 L.Ed.2d 152 (1959)). This standard has not been violated here. Parsons, the Park Service official who made the statement, is not the Park Service official (Fish) who made the final determination that the properties were approximately equal in value.[4] Even if we were to attribute to Fish the statement of Parsons, we could not say that the statement indicates that he had prejudged the facts and law of the issue before concluding the appraisal process. The statement makes no reference whatsoever to the approximately equal value issue. The statement is no more an indication of prejudgment than the Park Service's announcement that it believed that the proposed exchange was in the public interest. See J.A. at 238-45 (initial Environmental Assessment). Moreover, the final decision on the approximately equal value question appears, on its face, to have been the product of a reasonable review of the differing appraisals of the respective properties. See supra note 3; J.A. at 398 (decision on approximately equal value issued).
 
 III. CONCLUSION
 
 43
 It is not our place, on this appeal, to judge the wisdom of the proposed project. We are presented, instead, with several straightforward, albeit unique, legal questions. Because Sec. 9(c) does not apply to the proposed exchange, the district court order granting summary judgment to the plaintiffs must be reversed. In addition, because Sec. 22(b) does not mandate a hearing on the issue of whether the properties are approximately equal in value, and because the Park Service determination that the properties were, in fact, approximately equal in value is reasonable, we must remand this case to the district court with instructions to grant summary judgment to the defendants.
 
 
 44
 It is so ordered.
 
 
 
 [1]
 NCPC is a federal agency composed of representatives of federal agencies and local District government units. It exercises power delegated by Congress to designate property in the Washington metropolitan area as a unit of the National Park system. Once a property is so designated, it is administered by the Park Service. See D.C.Code Secs. 1-2009, 8-101 (1982)
 
 
 [2]
 We emphasize, for purposes of clarity, that Sec. 9(c) does not merely involve physical boundary changes. It applies equally to acquisitions of "lands, waters, or interests therein." Thus, as we observed previously, if the Georgetown Waterfront Park did not exist, this case would be controlled by Sec. 9(c)
 
 
 [3]
 We need not here detail the basis for our conclusion that the Park Service reasonably concluded that the properties to be exchanged were approximately equal in value. We may, however, sketch the contours of our review of this matter. We begin with the premise that the standard for review on this issue is highly deferential. Appellees concede that the Park Service determination may only be overturned if it is arbitrary and capricious. Great deference is due also because the matter is one largely within the technical expertise of the agency. Finally, Sec. 22(b) does not require that the agency establish that it has calculated the values of the properties to the last penny; the values need only be "approximately equal." With this standard in mind, we have reviewed the record materials to determine whether the Park Service has ignored any relevant issues and we have retraced its basic calculations. We have not, however, substituted our judgments on the merits of competing appraisals or required the agency to justify every underlying assumption
 While the Park Service calculations may not be the model of completeness or accuracy that appellees would wish, we are satisfied that they are reasonable. The issues appellees raise on this appeal have all, at some point, been addressed in the administrative proceedings before the Park Service and other agencies. The Park Service estimated, moreover, that the proposed exchange would provide a net advantage to the United States of $102,144. J.A. at 397-99. This estimate did not reflect additional benefits to the United States, including WHA maintenance obligations worth some $150,000 in the first year alone, and a commitment to provide a $1 million park on the site. Id. The Park Service estimate was surely reasonable.
 
 
 [4]
 Parsons is the Associate Regional Director, Land Use Coordination, National Capital Region, National Park Service. J.A. at 119. Manus J. Fish, Jr., is the Regional Director for the National Capital Region of the National Park Service. J.A. at 89. It is Mr. Fish who signed the document indicating that the properties to be exchanged were approximately equal in value. See J.A. at 399